IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| **ROBERT SANCHEZ TURNER**, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. |
| | ) | <u>3:17CV00064</u> |
| **AL THOMAS, JR.**, in his | ) | |
| individual capacity and his official | ) | |
| capacity as Chief of Charlottesville | ) | |
| Police Department, | ) | |
| | ) | |
| **CITY OF CHARLOTTESVILLE,** | ) | |
| **VIRGINIA**, and | ) | |
| | ) | |
| **W. STEVEN FLAHERTY**, in his | ) | |
| individual capacity, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| Defendants. | ) | |

## COMPLAINT FOR MONETARY DAMAGES

Robert Sanchez Turner files this action under 42 U.S.C. § 1983 to vindicate

his Constitutional Rights under the Fourteenth Amendment of the U.S.

Constitution.

## PRELIMINARY STATEMENT

By commanding their subordinates to stand down while hundreds of white

supremacists and their sympathizers assaulted and seriously injured counter-

protestors, these Defendants were essentially accessories to, and facilitators of,

unconstitutional hate crimes. Notably, Defendant Charlottesville Police Chief Al Thomas Jr. says there was no stand down order/policy, but those words ring hollow in front of hundreds of witnesses and victims. In fact, in a confidential memo dated Thursday, August 24, 2017 to City Manager Maurice Jones, the City Council demanded an explanation for the "apparent unwillingness of officers to directly intervene during overt assaults captured in many videos." Simply put, that many officers do not fail to intervene in the face of absolute and numerous hate crimes without a direct order from their superior officers, ordering them *not* to intervene.

This failure to intervene becomes even more outrageous given the fact that, three days prior to the August 12th hate crimes, the Department of Homeland Security ("DHS") warned these Defendants that the gathering of white supremacists would most likely spark the most violent clash to date between nazi sympathizers and counter protesters. In the words of one retired FBI supervisory special agent: "it is unconscionable that with so much advance notice of the declared intentions of extremist groups from the left and right vowing to descend upon Charlottesville that law enforcement was not better prepared."

Among the victims is the Plaintiff, Robert Sanchez Turner, who had his eyes doused with pepper spray, his body beaten with canes and urine thrown at him, while the Defendants' subordinate officers stood and watched – within 10

2

feet of the assault – and did absolutely nothing to stop the assault, or anything to apprehend Mr. Turner's known assailants.

For weeks, Chief Thomas and Virginia State Police Superintendent, Colonel W. Steven Flaherty, knew, based on training and experience, the rally in downtown Charlottesville hosted by white supremacists had a very high likelihood of turning violent and would require police intervention. Police planned accordingly. When the City revoked the white supremacists' permit and tried to move the rally to another park, Jason Kessler, a white supremacist organizer, met with the City and the City Police, and they told Kessler that the Police would still be present in the original location, Emancipation Park, and would create a heavy police presence and barrier between rally-attendees and counter-protesters. Only days later, the City Police did an about-face and affirmatively told Kessler that they would no longer be honoring their word and protecting the counter-protesters and the rally-goers from violent conflict. With the help of the American Civil Liberties Union ("ACLU"), Kessler filed suit and won, and this Court enjoined the City to reinstate the permit.

Chief Thomas did not like this outcome and felt he needed to prove that he was right all along. In a deranged twist of logic, Chief Thomas, together with Colonel Flaherty, issued a "stand down" order for all police officers under their command to refrain from intervening, confronting, or offering any help when

3

faced with violent hate crimes unfolding before their eyes. Mr. Turner was but one victim of this "stand down" order which, effectively, unleashed hell on peaceful protesters and minorities expecting the police to do their jobs and protect them. Instead, the police followed their orders from Chief Thomas and Colonel Flaherty.

Chief Thomas has publicly denied issuing this "stand down" order, however, the events of August 12th have been seared into the minds of millions across the globe and etched into our history. Simply put, the police under the command of Chief Thomas and Colonel Flaherty stood down. Police in Virginia are heroes, risking their lives daily to protect people and save lives. Heroes of this magnitude would not have stood down without being told to do so, in whatever manner that order was communicated. The result is clear, Chief Thomas's and Colonel Flaherty's subordinates' lack of action caused the historically tragic events on August 12th in Charlottesville, and those who caused the police to stand down must be held accountable.

In sum, there is absolutely a triable issue as to whether a stand down policy/order was implemented, because video evidence and witness testimony of hundreds of people demonstrate that law enforcement did absolutely nothing in the face of gross, unconstitutional violence.

## JURISDICTION AND VENUE

### 1.

Jurisdiction is proper under 28 U.S.C. § 1331 and 1343(a)(4), as well as under 42 U.S.C. § 1983. And Venue is proper under 28 U.S.C. § 1391(b) and on the supplemental jurisdiction of this Court to adjudicate claims arising under state law pursuant to 28 U.S.C. § 1367(a).

## THE PARTIES

**A. Robert S. Turner, Plaintiff**

### 2.

Mr. Turner is a resident of Virginia and competent to stand trial to defend all claims he has made against these Defendants. At the time of the filing of this Complaint, Mr. Turner is 33 years old and currently employed.

**B. Al Thomas, Jr., Defendant**

### 3.

At all times relevant, Al Thomas, Jr. was the Chief of the Charlottesville Police Department. As Chief of the Charlottesville Police Department, Al Thomas, Jr. reported directly to the City Manager, Maurice Jones. At all times relevant, Chief Thomas was the policy maker for the City of Charlottesville with respect crowd control and roti control regarding first amendment protest held within the city limits, including Emancipation Park.

5

### C.  W. Steven Flaherty, Defendant

4.

At all times relevant, Colonel W. Steven Flaherty was the Virginia State Police Superintendent and served as the chief executive officer of the Virginia Department of State Police.

### D. The City of Charlottesville, Virginia, Defendant

5.

Charlottesville, Virginia (the "City") is a municipality located in the state of Virginia in the United States of America. The City may be sued for state claims under Virginia state law and federal claims under 42 U.S.C. § 1983.

## RELEVANT FACTS

### A.  Emancipation Park

6.

The City of Charlottesville owns the park bounded by Jefferson Street, First Street N.E., Market Street and Second Street N.E ("the Park").

7.

Historically, the Park was known as "Lee Park." On June 5, 2017, the City renamed the Park "Emancipation Park."

8.

Emancipation Park houses a statue of Robert E. Lee. The City plans to sell the statue and have it removed from the Park.

9.

The City's decision to rename the Park and sell the statue have resulted in a number of protests in the Park, including an unpermitted nighttime torch lit march on May 13, 2017 in which organizers and attendees of the August 12th rally participated.

10.

Jason Kessler, leader and founder of the white nationalist group "Unity & Security for America," opposes both the name change and the planned removal of the statue. Kessler organized a "Unite the Right" rally in the Park to express opposition to both decisions by the City.

11.

Kessler claimed that his choice of location was critical to the message of the rally, which specifically opposes two City policy choices about the Park, and that holding the protest elsewhere would dilute and alter his message.

### B.  The City Grants the White Supremacists a Permit

12.

The City requires persons wishing to exercise their First Amendment rights

on its public land to obtain a permit, and on May 30, 2017, Kessler applied for a

permit to hold a "[f]ree speech rally in support of the Lee monument" in the Park

on Saturday, August 12, 2017.

13.

In the permit application, Kessler estimated that approximately four

hundred people would demonstrate at the planned rally.

14.

Pursuant to City of Charlottesville SOP § 3.4.6(b), the City granted Kessler's

permit application on June 13, 2017.

### C.  The City Revokes the White Supremacists' Permit

15.

On August 7, 2017, more than a month after granting the permit and less

than a week before the planned rally, City Manager Maurice Jones sent Kessler a

letter on behalf of the City revoking the permit to demonstrate in Emancipation

Park and offering Kessler an alternative permit to demonstrate in McIntire Park,

located one mile away from Emancipation Park.

16.

The City claimed that it revoked the permit for Emancipation Park because "it [came] to the City's attention that many thousands of individuals are likely to attend the demonstration" and the City would be "unable to accommodate safely even a peaceful crowd of this size" in Emancipation Park, and that "the presence of such a large demonstration in Emancipation Park would ... lead[] to massive traffic congestion[.]"

17.

The City also noted that "[t]he use of McIntire Park will still require the deployment of considerable law enforcement resources[.]"

18.

Leading up to August 12, 2017, the City Police Department claimed it was preparing for the possibility that people would gather at both parks during the rally and announced that it planned to deploy resources in the downtown area at and around Emancipation Park.

19.

The City granted permits for demonstrations opposing white supremacists' views to occur on August 12, 2017 in Justice and McGuffey Parks located blocks away from Emancipation Park. Those demonstrations were organized to protest "the messages of racial intolerance and hatred advocated by" the white

supremacists attending the demonstration in the Park. The organizers of these

other events encouraged and expected an attendance of more than 1,000 persons.

20.

In explaining its plans to prepare for rallies at both Emancipation Park and

McIntire Park, the City acknowledged the likelihood of violence between the two

groups with opposite beliefs: "[w]ith large crowds of individuals with strongly

held and potentially opposing beliefs, there is also the potential for conflict." See

City preparing for large crowds Saturday, Daily Progress (Aug. 9, 2017), available

at http://www.dailyprogress.com/news/city-preparing-for-large-crowds-

saturday/article_94918c6c-7d57-11e7-901e-afca3a9eb91b.html. This builds on the

City's experience during the Ku Klux Rally in downtown Charlottesville on July

8, 2017.

### D. The City's Reason for Revocation

21.

The City stated that the decision to revoke and modify Kessler's permit was

a "numbers" decision based on a belief that "many thousands" of people both

supportive of white supremacists and opposed to white supremacists would

attend.

10

22.

The Charlottesville Police Department has the ability, protocols, and experience to deploy not only its own officers to provide protection of citizens' exercise of First Amendment rights but also officers from the Virginia State Police, other local law enforcement agencies, and the Virginia National Guard. This was demonstrated during the July 8, 2017 Ku Klux Klan rally.

23.

During the press conference held on August 7, 2017, at which the City announced the decision to revoke Kessler's permit, Chief Thomas never said that his department could not provide adequate protection for Kessler's proposed rally at Emancipation Park using the City's active duty police force and, if necessary, additional local, state and federal forces. The Chief's statement included information about why his department felt that having the demonstration in McIntire Park would be "safer" but did not say that the Department would be "unable" to protect the safety of demonstrators, counter-demonstrators and the public in the downtown Emancipation Park location, especially if the City were to enact the preliminary plans for road closures announced on August 9, 2017.

24.

On August 9, 2017, the City also announced that its police department had been working with other police agencies, including the Virginia State Police, to prepare for the rally and that the local and state forces together intend to "have a visible presence" at the rally. The City also stated that the National Guard Forces would monitor events and respond if needed.

25.

At the Charlottesville City Council meeting on Monday, July 17, 2017, 13 of the 15 people who spoke during the public comment period either criticized the actions of the Charlottesville Police Department and the Virginia State Police during and after the Ku Klux Klan rally on July 8 or advocated that the permit granted to Kessler for the August 12th demonstration be revoked or reissued for McIntire Park because of their opposition to the Kessler's message or both. When the City Manager began to respond to the public comments about the police actions at the July 8th event taken against counter-demonstrators during and after the Ku Klux Klan representatives were demonstrating, the crowd became disruptive, yelling "liar," and the Mayor suspended the meeting rather than have police personnel remove those who were disrupting the City Manager's comments. The City acted in secret, without the benefit of thorough public

engagement, arrogantly insuring the confusion that followed through the events of August 12th.

26.

On July 27, 2017, 43 downtown businesses wrote a letter to Council demanding that the City treat the planned August 12th demonstration like a public event and impose additional requirements on the organizer and that it consider moving the event because of the risk to public safety and their businesses. One business owner who signed the letter said that "the organizer and other would-be attendees" at the demonstration had "crossed the line from free speech to basically a call to imminent lawless action."

27.

Despite representations that the decision to revoke the Kessler's permit was made by City Manager, there was a closed three-hour meeting of City Council on August 2, 2017 at which the City Manager, City Attorney and other staff, including some representatives of law enforcement, were present. Council issued a statement that evening about the subject of the meeting: "This evening, Charlottesville City Council met in closed session to consult with legal counsel and staff regarding the best options to keep the community safe during the August 12 Unite the Right Rally while preserving the 1st amendment rights of participants." Notably absent from this meeting were members of the very

community to be affected by the city's coming failure to execute police resources
to keep them safe.

28.

Kessler met with City Manager Maurice Jones, Park's Business Operations
Supervisor Michelle Christian and Police Captain Wendy Lewis the morning of
Monday, August 7th. At the meeting, the City Manager asked Kessler to accept
the City's decision to modify his permit for McIntire Park.

29.

Later on August 7th, after the press conference where the City announced
that the permit for Emancipation Park was revoked, Kessler entered a closed door
meeting with Captain Lewis, Chief Thomas and Incident Commander Captain
Victor Mitchell. Kessler asked if the police would still enforce previously agreed
upon security arrangements for the Unite the Right demonstration in the Park
whether there was a permit for that site or not. Chief Thomas indicated in the
affirmative. Kessler asked Chief Thomas if the police would still keep
counter-demonstrators out of the park prior to the Unite the Right demonstration
and he indicated in the affirmative. Kessler also asked Chief Thomas if the police
would still set up barricades around the park and allow Unite the Right to control
access into the park via two entrance points on the Market Street side of the park
as was previously agreed upon. Chief Thomas indicated in the affirmative.

14

30.

The next day on Tuesday, August 8th Kessler met with Captain Lewis, Captain Mitchell and one other police official. They told Kessler that ***Chief Thomas changed his mind*** and that the demonstration would receive ***none of the protections in Emancipation Park promised the day before***. The police representatives also told Kessler that the police would only keep people out of Lee Park until 6 a.m. when it typically opens instead of allowing Unite the Right to restrict access to their demonstrators as had previously been agreed. The police said that the Park would be divided in half between demonstrators and counter-demonstrators. Kessler asked how the police intended to tell one from the other or to preserve distinct areas for demonstrators with opposing views*. **The police representatives told Kessler that there was no plan for them to do that***.

31.

Before leaving the meeting on August 8th, Kessler asked if Parks and Recreation would allow use of the power or water in the park and they said no. Kessler asked why all these changes had been made to security and the policy of Parks and Recreation and if this was due to political pressure. Captain Lewis indicated affirmatively with her facial expression and body language.

### E.  White Nationalists and the ACLU file a lawsuit against the City

32.

Kessler filed a lawsuit with the help of the ACLU, claiming that the City violated his First and Fourteenth Amendment rights.

33.

In the suit, Kessler argued that McIntire Park was not connected to Kessler's white nationalist message, and that relocating to McIntire Park would substantially undermine his ability to communicate his message about the renaming of Emancipation Park and the decision to remove the Lee statue from the Park.

34.

Kessler argued that the City's claim that it cannot safely manage a demonstration involving 400 people and possibly "thousands" was belied by the fact that the City routinely manages crowds of up to 3,500 people at the Sprint Pavilion on the Downtown Mall and previously has granted permits for rallies and events with "thousands" of attendees in Emancipation Park without incident or intervention from the City. For example, in 2013, 2014 and 2015 an estimated minimum 2,000 people attended the Cville Pride Festival in Emancipation Park each year, thousands of people attend an annual Spring block party in

Emancipation Park, and on May 14, 2016, it was reported that "thousands" of people gathered in the Park for a Festival of Cultures event.

35.

Kessler also noted that people have been allowed to demonstrate in the Park without permits in circumstances where the number of potential participants could not be forecast. On May 14, 2017 after a torch lit demonstration the previous night protesting the renaming of Emancipation Park and proposed removal of the Lee Statue, a candlelight vigil was held in the Park by counter- protestors without incident. Neither event was permitted.

36.

The lawsuit argued that unless the City, City Manager Jones and their agents were enjoined, Kessler, "other similarly-situated protesters who share his views, and other members of the public will be irreparably harmed as they will be prevented from peacefully gathering to express their views on pressing issues of public concern at a time, place and in a manner reasonable for them to do so."

37.

On August 11, 2017, this Court ruled in Kessler's favor and issued a preliminary injunction ordering the City to permit the demonstration to proceed in Emancipation Park. This Court's ruling, which sought to protect speech no matter how vile pursuant to the First Amendment, then required the City to

accommodate Kessler's original permit and planned demonstration in Emancipation Park. The City did not have the authority to order its officers to stand down. Chief Thomas, Colonel Flaherty and the City maintained their responsibility to protect the people of the City of Charlottesville and all who gathered there peacefully that day.

**F. Chief Thomas and Colonel Flaherty order officers to "stand down"**

38.

Chief Thomas was in charge of police planning, operations, and response on Saturday, August 12, 2017.

39.

In his own words, Chief Thomas "was the commander for this incident" and "oversaw the operation and was the final say."

40.

Chief Thomas was enraged by this Court's ruling that required the City to reissue the permit for Kessler to hold the rally in Emancipation Park because Thomas had pushed for the rally to be held in the alternative location of McIntyre Park.

41.

Colonel Flaherty, Virginia State Police Superintendent, was also enraged at the court's decision in favor of Kessler and the ACLU.

42.

Chief Thomas felt he wanted to prove that despite the court's ruling, he
was in the right.

43.

Colonel Flaherty too felt he wanted to prove that despite the court's ruling,
he was in the right.

44.

Chief Thomas took it upon himself to institute a special policy for the soon-
to-be tragic day. Chief Thomas's policy was communicated to his officers,
ordering his officers to "stand down" on August 12th.

45.

Specifically, Chief Thomas ordered Charlottesville City Police to refrain
from intervening in any violent confrontations between white supremacists and
counter-protesters unless given a direct command to do so. The "stand down"
order was so absolute that officers were ordered to restrain from intervening *even
upon observing hate crimes in the form of brutal physical attacks with weapons
by KKK members and sympathizers against unarmed civilians.*

46.

Colonel Flaherty chose to communicate the same "stand down" policy to
the State Troopers under his command.

47.

In a written statement after the events of August 12, Chief Thomas stated

the following:

> I was the commander for this incident, but our command center was a
> unified command, including Virginia State Police, Albemarle County Police,
> University Police, federal authorities and the National Guard.  The command
> center also included personnel from our fire and EMS services and support
> staff.  While a unified command works together to make critical decisions, I
> oversaw the operation and was the final say.

48.

Pursuant to the chain of command outlined by Chief Thomas, his "stand

down" order was the "final say" for participating law enforcement agencies,

including Virginia State Police, Albemarle County Police, University Police,

federal authorities and the National Guard, and the final say for personnel from

fire and EMS services.

49.

According to the ACLU, **a law enforcement officer at the scene told

demonstrators, "We'll not intervene unless given a command to do so."**

50.

One peaceful counter protester asked a police officer if the police were

going to clear out the area where KKK members/sympathizers were launching

violent attacks, and the officer responded by saying, **"That's not my job."**

51.

In a confidential memo dated Thursday, August 24, 2017 to City Manager

Maurice Jones, the City Council demanded an explanation for the "apparent

unwillingness of officers to directly intervene during overt assaults captured in

many videos."

**G. The preventable tragedy of Saturday, August 12, 2017**

52.

On Saturday, August 12, 2017, Plaintiff Robert Turner went to

Emancipation Park to exercise his right to peaceful assembly on the side walk and

street in front of the Park.

53.

During his attendance, Mr. Turner peacefully protested the words and

symbols of racism on display at Emancipation Park and video recorded what he

observed.

54.

At all times relevant, Mr. Turner did not verbally taunt any one, including

KKK members/sympathizers.

55.

At all times relevant, Mr. Turner did not physically strike anyone,

including KKK members/sympathizers.

56.

At all times relevant, Mr. Turner did not attempt to physically strike anyone, including KKK members/sympathizers.

57.

While in attendance, Mr. Turner saw KKK members/sympathizers coming out of the park to engage counter protesters who were on the sidewalk adjacent to the park.

58.

Leading up to, during, and immediately following his attack, police made no effort to stop KKK members/sympathizers from physically engaging with counter protesters.

59.

Police were within 10 feet of Mr. Turner when KKK members/sympathizers approached him and began spraying mace in his eyes and beating him with a stick.

60.

While being beaten, Mr. Turner looked up and saw that police made no attempt to stop the assault.

61.

Charlottesville Police and Virginia State Patrol officers stood and watched

Mr. Turner being maced in his eyes and beaten for more than 30 seconds, while

doing nothing to intervene.

62.

Charlottesville Police and Virginia State Patrol officers made no attempt to

arrest the two people who physically assaulted Mr. Turner; instead,

Charlottesville Police and Virginia State Patrol officers watched the two assailants

walk away.

63.

Mr. Turner visually observed his assailants walk away while

Charlottesville Police and Virginia State Patrol officers stood and watched the

assailants walk away

64.

Mr. Turner was hit in the body and head by bottles of urine being hurled by

KKK members/sympathizers who were in Emancipation Park, as Mr. Turner

stood peacefully on the sidewalk immediately adjacent to the park.

65.

Mr. Turner saw people hurling water bottles and bottles filled with cement

and urine at multiple counter protesters.

66.

Virginia State Troopers saw protesters in Emancipation Park hurling water

bottles and objects at counter protesters and never arrested any of the people who

were seen throwing these objects.

67.

Virginia State Troopers saw protesters in Emancipation Park hurling water

bottles and objects at counter protesters and never took any steps to discipline

any of the people who were seen throwing these objects.

68.

Virginia State Troopers saw armed self-proclaimed "militia" arrive wearing

military equipment and carrying long rifles.

69.

One peaceful counter protester asked a policeman if the police were going

to clear out the area where KKK members/sympathizers were launching violent

attacks, and the officer responded by saying, **"That's not my job."**

### H. City declares an unlawful assembly and Virginia Governor McAuliffe declares a state of emergency

70.

At 11:22 a.m. on August 12, over 5 hours after people began arriving at the

rally, and well after multiple attacks had occurred in plain view of police officers

while those officers stood idly by and refrained from intervening or even helping

injured people, the City declared an unlawful assembly, and police left the scene

to change into riot gear. Law enforcement officials, under these Defendants

command, failed to show up in riot gear despite being warned by the DHS that

the protest posed a high risk of turning into the most violent clash between White

Supremacists and counter protestors to date. Chief Thomas and Colonel Flaherty

ordered their subordinates not to show up in riot gear despite knowing of the

DHS's said warning, and despite actually reading the subject DHS report and

being briefed

71.

After returning in riot gear, the police began to "clear" the Park, forcing all

of the white supremacists out of the Park and directly into the crowd of counter-

protesters, resulting in multiple other violent attacks and severe injuries.

I.  **City Council confidentially seeks answers from the City Manager for
    multiple reports and video depicting police officers refusing to
    intervene or help people being attacked**

72.

In a confidential memo dated Thursday, August 24, 2017 to City Manager

Maurice Jones, the City Council demanded an explanation for the "apparent

unwillingness of officers to directly intervene during overt assaults captured in

many videos."

## COUNT I

### FAILURE TO INTERVENE IN A STATE-CREATED DANGER: VIOLATION OF MR. TURNER'S FOURTEENTH AMENDMENT DUE PROCESS RIGHTS UNDER 42 U.S.C. § 1983
*(Against Defendants Thomas and Flaherty in their individual capacities)*

By law:

> A "key requirement" for liability under the state-created danger doctrine is that the state actor increase or create the danger through "affirmative conduct." . . . The state, through its affirmative acts, must "itself create[ ] the dangerous situation that resulted in a victim's injury," such that "it becomes much more akin to an actor itself directly causing harm to the injured party." . . . "No constitutional liability exists where the State actors 'had no hand in creating the danger but [simply] stood by and did nothing when suspicious circumstances dictated a more active role for them.' " . . . We cannot "stretch[ ] the concept of 'affirmative acts' beyond the context of immediate interactions between the [state actor] and the plaintiff."

Doe v. Rosa, 795 F.3d 429, 440–41 (4th Cir. 2015), cert. denied sub nom. John Doe 2 v. Rosa, 136 S. Ct. 811, 193 L. Ed. 2d 715 (2016) (citations omitted; bracketed language in original).

73.

Plaintiff fully incorporates paragraphs 1 through 72, *and any paragraph this Court deems relevant*, as full stated herein to support this Count.

74.

Based on the incorporated facts to support this Count, Chief Thomas took the affirmative action of implementing a policy, by his direct order, which commanded police officers subordinate to his command to "stand down" and refrain from intervening in violent attacks by white supremacists. This affirmative

action by Chief Thomas created a danger that permitted thousands of people to attend a rally that Thomas knew would likely result in violent confrontations between white supremacists and counter-protesters. By implementing his policy (his "stand down" order) Chief Thomas permitted these thousands of people to attend an event with nearly guaranteed violence and, because of Chief Thomas's "stand down" order, Chief Thomas guaranteed refusal by all police officers to intervene in the violence in any way – or even help injured, peaceful civilians. As a result of Chief Thomas's actions, Mr. Turner was viciously beaten and suffered injuries in front of a group of police officers who refused to intervene, refused to confront, reprimand, detain, or arrest his attackers, and refused to help him in any way.

75.

By separately ordering the police officers under his command to "stand down" and refrain from intervening in violent attacks by white supremacists, Colonel Flaherty created a danger that permitted thousands of people to attend a rally that Colonel Flaherty knew would likely result in violent confrontations between white supremacists and counter-protesters. By issuing the "stand down" order, Colonel Flaherty permitted these thousands of people to attend an event with nearly guaranteed violence and, because of Colonel Flaherty's "stand down" order, Colonel Flaherty guaranteed refusal by all police officers to intervene in the

violence in any way – or even help injured, peaceful civilians. As a result of

Colonel Flaherty's actions, Mr. Turner was viciously beaten and suffered injuries

in front of a group of police officers who refused to intervene, refused to confront,

reprimand, detain, or arrest his attackers, and refused to help him in any way.

76.

As such, Chief Thomas and Colonel Flaherty are liable to Mr. Turner for all

permissible damages as well as attorney's fees and costs of bringing this

litigation.

## COUNT II

### SUPERVISORY LIABILITY:
### VIOLATION OF MR. TURNER'S FOURTEENTH AMENDMENT RIGHTS UNDER 42 U.S.C. § 1983
*(Against Defendants Thomas and Flaherty in their individual capacities)*

77.

Plaintiff fully incorporates paragraphs 1 through 72, *and any paragraph this

Court deems relevant*, as full stated herein to support this Count.

78.

Based on the incorporated facts to support this Count, and because Chief

Thomas and Colonel Flaherty created and ratified a policy that facilitated and

condoned hate crimes and other criminal conduct by ordering subordinate

officers not to intervene in the face of hate crimes and criminal conduct that could

have been easily been prevented/stopped with their intervention, both Chief

Thomas and Colonel Flaherty are liable to Mr. Turner for all permissible damages

as well as attorney's fees and cost of bringing this litigation.

## COUNT III

### MONELL CLAIM:
### FAILURE TO INTERVENE:
### VIOLATION OF MR. TURNER'S FOURTEENTH AMENDMENT
### SUBSTANTIVE DUE PROCESS RIGHTS
### UNDER 42 U.S.C. § 1983
*(Against Defendant City of Charlottesville, Virginia)*

79.

Plaintiff fully incorporates paragraphs 1 through 72, *and any paragraph this*

*Court deems relevant*, as full stated herein to support this Count.

80.

Based on the incorporated facts to support this Count, Chief Thomas

created and subsequently issued the subject "stand down" order/policy; Chief

Thomas instituted an unconstitutional policy of requiring all police officers under

his command to refrain from intervening in violent hate crimes, to refrain from

confronting, reprimanding, detaining, or arresting white supremacists who attack

peaceful protesters, and to refrain from helping civilians injured by violence at the

rally in any way. This policy was unconstitutional because it standardized across

the entire Charlottesville Police Department a policy of non-intervention in the

face of violent hate crimes. The subject policy was the motivating factor and driving force behind officers failing to intervene while Mr. Turner was being doused with pepper spray and beaten—as said officer were standing within a distance that easily permitted them to stop the assault had they chosen to stop said assault.

81.

As a result of the City's unconstitutional policy, Mr. Turner was permitted to be viciously beaten and suffered injuries in front of a group of police officers who refused to intervene, refused to confront, reprimand, detain, or arrest his attackers, and refused to help him in any way.

82.

As such, the City of Charlottesville is liable to Mr. Turner for all permissible damages as well as attorney's fees and cost of bringing this litigation.

## COUNT IV

### DELIBERATE INDIFFERENCE
### IN VIOLATION OF FOURTEENTH AMENDMENT
### SUBSTANTIVE DUE PROCESS RIGHTS
### UNDER 42 U.S.C. § 1983
*(Against Defendants Thomas and Flaherty in their individual capacities)*

83.

Plaintiff fully incorporates paragraphs 1 through 72, *and any paragraph this Court deems relevant*, as full stated herein to support this Count.

84.

Based on the facts incorporated in this Count, Defendants Chief Thomas and Colonel Flaherty showed deliberate indifference to Mr. Turner. To be sure, these Defendants appreciated a substantial risk of harm to Mr. Turner and all counter protestors, based on recent past experience with the white supremacist groups, and completely contrary to taking reasonable steps to prevent a known risk of seriously bodily injury to Mr. Turner and other counter-protestors, these Defendants actually implemented a policy that substantially increased the harm to Mr. Turner and ultimately caused his injuries. Consequently, Mr. Turner is entitled to damages.

## COUNT V

### PUNITIVE DAMAGES
*(Against Defendants Thomas and Flaherty in their individual capacities)*

**Based on the facts alleged in this Complaint**, Plaintiff is entitled to punitive damages, under all applicable laws, because Defendants acted with a willful and conscience indifference to the laws that protect Mr. Turner's Constitutional rights.

## COUNT VI

### ATTORNEY FEES

**Based on the facts alleged in this Complaint,** Mr. Turner is entitled to

attorney fees, under all applicable laws.

**WHEREFORE**, Mr. Turner prays for a trial by jury of twelve and judgment

against Defendants as follows:

(a) That process issue and service be had on each Defendant;

(b) That Plaintiff be awarded all other expenses in an amount to be

determined at trial, including attorney fees;

(c) That Plaintiff recover all costs of this litigation;

(d) That a jury trial be had on all issues so triable;

(e) Plaintiff have Judgment against Defendants for punitive damages; and

(f) That Plaintiff receives such other and further relief as this Court deems

just and proper.

Respectfully submitted on this 31st day of August 2017,

By */s/ Jessica N. Sherman-Stoltz*
Jessica N. Sherman-Stoltz
VA Bar No. 90172
Nexus Caridades Attorneys, Inc.
113 Mill Place Pkwy., Suite 105A
Verona, VA 24482
(540) 466-3596 / (540) 301-8158 FAX
jstoltz@nexuscaridades.com