IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
Charlottesville Division

ROBERT SANCHEZ TURNER,

    *Plaintiff,*

v.                                                  Civil Action No. **3:17CV00064**

AL THOMAS, JR.,
CITY OF CHARLOTTESVILLE, VIRGINIA,
and W. STEVEN FLAHERTY,

    *Defendants*.

## BRIEF IN SUPPORT OF MOTION TO DISMISS

COMES NOW the City of Charlottesville, Virginia, by counsel, and submits the following argument and authorities in support of its Motion to Dismiss filed this date:

**THE "POLICY" TURNER CLAIMS THAT CITY OF CHARLOTTESVILLE POLICE CHIEF THOMAS ADOPTED TO "STAND DOWN" AND NOT TO INTERVENE, UNLESS COMMANDED TO DO SO, IN PRIVATE ACTS OF VIOLENCE BY THIRD PARTIES AT THE AUGUST 12, 2017 RALLY DOES NOT VIOLATE THE SUBSTANTIVE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT. TURNER FAILS TO STATE A PLAUSIBLE CLAIM OF RELIEF UNDER THE FOURTEENTH AMENDMENT AGAINST THE CITY UNDER *MONELL*.**

In summary, for the reasons stated in more detail below, the Complaint fails to state a plausible claim under *Monell v. Dep't of Social Services,* 436 U.S. 658, 690-691 (1978) of a violation of substantive due process under the Fourteenth Amendment since in *DeShaney v. Winnebago County Dept. of Social Services*, 49 U.S. 189 (1989), the United States Supreme Court rejected Turner's Fourteenth Amendment "failure to intervene" claim. In *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995), the Fourth Circuit, in applying *DeShaney*, "squarely rejected liability under 42 U.S.C. §1983 based on an affirmative duty theory". In *DeShaney*, the United States Supreme Court held that, "The due process clause of the Fourteenth Amendment does not require governmental actors to

affirmatively protect life, liberty or property against intrusion by private third parties". *DeShaney* at 195. In *Pinder*, the Fourth Circuit found that under *DeShaney*, the due process clause of the Fourteenth Amendment works only as a negative prohibition on state actions. It relied on the Court's finding in *DeShaney* that the purpose of the due process clause "was to protect the people from the State, and not to insure that the State protected them from each other". *Pinder* at 1174. Turner, like DeShaney and Pinder, wants the City of Charlottesville to be held liable for an alleged "policy" of inaction and standing by when its police, but for its police chief's alleged policy, he claims, would have acted to prevent Turner's injuries by third parties.

Under settled law, if there is no plausible claim of Fourteenth Amendment claim alleged against Chief Thomas, individually, the City cannot be liable under §1983 for his alleged, but publicly denied, middle of the night "special policy". In addition to its arguments below, the City of Charlottesville relies on any arguments Co-Defendant Al Thomas, Jr. makes in his Motion to Dismiss and brief in support thereof filed on his behalf that the Complaint fails to state a claim for relief against Chief Thomas under the Fourteenth Amendment.

**ALLEGATIONS IN TURNER'S COMPLAINT PERTAINING TO HIS CLAIM OF A FOURTEENTH AMENDMENT SUBSTANTIVE DUE PROCESS VIOLATION.**

In his Complaint, Robert S. Turner ("Turner") even acknowledges that "notably", Chief Thomas has publicly **denied** issuing the supposed "stand down" order (Doc #1, p. 2 & 4) on which he relies as the basis for his Complaint. The essence of the allegations in Turner's Complaint concerning a claimed municipal "policy" is that although its own police chief denied creating such a policy, he must have done so or, Turner argues, the City of Charlottesville Police officers would have intervened to assist him at the protest rally when he was allegedly assaulted while counter protesting by third party White Supremacists. In the "Preliminary Statement" in his Complaint, Turner describes

the origin and content of the policy he attempts to attribute to Chief Thomas as follows. He speculates that while Chief Thomas publicly stated that there was no stand down order-policy, "Simply put, that many officers would not fail to intervene in the face of absolute numerous hate crimes without a direct order from their superior officers, ordering them not to intervene" (Doc 1, p. 2).

In Turner's "Preliminary Statement" in his Complaint, he alleges that Chief Thomas enacted the alleged municipal policy in the middle of the night on August 11, 2017 after he became enraged because he did not like the outcome of proceedings in this Court that afternoon when, later that night, the Court issued an Order enjoining the City to "reinstate the Permit" to allow the rally to be held in Emancipation Park. The Complaint alleges a personal motive on Chief Thomas' part in that he "did not like this outcome and felt he needed to prove that he was right all along". In what Turner characterizes as a "deranged twist of logic", he claims that Chief Thomas, together with Virginia State Police Superintendent Col. Flaherty, issued a "stand down" order for all police officers under their command to refrain from intervening, confronting, or offering any help when faced with violent hate crimes unfolding before their eyes" (Doc #1, p.3).

In his "Preliminary Statement" Turner actually acknowledges uncertainty concerning the existence of his postulated policy and argues that, "In sum, there is absolutely a triable issue as to whether a stand down policy/order was implemented, because video evidence and witness testimony of hundreds of people demonstrate that law enforcement did absolutely nothing in the face of gross, unconstitutional violence" (Doc 1, p. 4). In ¶37 of his Complaint, Turner alleges that on August 11, 2017, the Court ruled in Kessler's favor and issued a preliminary injunction ordering the City to permit the demonstration to proceed in Emancipation Park. He goes on to claim in this paragraph that this Court's ruling, which sought to protect speech no matter how vile pursuant to the First Amendment, then required the City to accommodate Kessler's original Permit and planned demonstration in Emancipation Park. In ¶¶38-46 of his Complaint, Turner elaborates on the "stand down" policy upon

3

which he bases his sole attempted claim in this case of a violation of his substantive due process rights. Turner alleges that Chief Thomas was in charge of police planning, operations, and response on Saturday, August 12, 2017 (¶38) and that he was the commander for this incident (¶39). He goes on to specifically allege that Chief Thomas' motivation in issuing his "special policy" was that he "was enraged by this Court's ruling that required the City to reissue the permit for Kessler to hold the rally in Emancipation Park because Thomas had pushed for the rally to be held in the alternative location of McIntyre Park" (¶40). Turner claims that Co-Defendant W. Steven Flaherty, Virginia State Police Superintendent, was similarly enraged (¶41) and that he also felt he wanted to prove that despite the Court's ruling, he was right (¶43). Turner alleges that Chief Thomas' actions were personal because he "felt he wanted to prove despite the Court's ruling, he was in the right" (¶42) and then specifically that, "Chief Thomas **took it upon himself** to institute a **special policy** for the soon to be tragic day". (Emphasis supplied.) He alleges that Chief Thomas' policy was communicated to his officers, ordering his officers to 'stand down' on August 12 (¶44). Turner defines the "special policy" alleging that, "Specifically, Chief Thomas ordered Charlottesville City Police to refrain from intervening in any violent confrontations between white supremacists and counter-protesters unless given a direct command to do so. The 'stand down' order was so absolute that officers were ordered to refrain from intervening, even upon observing hate crimes in the form of brutal physical attacks with weapons by KKK members and sympathizers against unarmed civilians." (¶45) In his Complaint Turner claims as the "factual" basis for the "policy" he relies on, two hearsay statements he attributes to unknown third parties that, "According to the ACLU, a law enforcement officer (he does not identify the officer or even allege it was a Charlottesville Police Department officer) at the scene told demonstrators, 'We'll not intervene unless given the command to do so[.]'" (¶49) and that, "One peaceful counter protester asked a police officer (again, he does not identify the officer or allege that it was even a Charlottesville Police Department officer) if the police were going to clear out the area where KKK

4

members 'sympathizers were launching violent attacks, and the officer responded by saying, 'That's not my job'" (¶50). Turner does not allege that either unnamed officer was even a Charlottesville Police Department officer. Turner voluntarily attended the August 12, 2017 rally, he alleges, to "exercise his right to peaceful assembly on the sidewalk and street in front of the park" (¶52). He adds that during his attendance, he "peacefully protested the words and symbols of racism on display at Emancipation Park and video recorded what he observed" (¶53). Turner denies verbally taunting anyone or physically striking anyone including KKK members/sympathizers (¶¶54-55). He alleges that "police were within ten feet" of him when KKK members/sympathizers approached him and "began spraying mace in his eyes and beating him with a stick" (¶59) and that while being beaten, he looked up and saw that the police made no attempt to stop the assault (¶60). He further claims that Charlottesville Police and Virginia State Police officers stood and watched him being maced in the eyes for more than thirty seconds while doing nothing to intervene (¶61) and, finally, that the Charlottesville Police Department and Virginia State Police officers made no attempt to arrest the two people who physically assaulted him and simply watched them walk away. **He does not allege any affirmative conduct by Chief Thomas or any Charlottesville Police officer.**

**THE "SPECIAL POLICY" THAT TURNER ALLEGES THAT THE CITY'S POLICE CHIEF ADOPTED IN THE MIDDLE OF THE NIGHT PERTAINING TO THE AUGUST 12, 2017 RALLY THE FOLLOWING DAY WHICH TURNER CLAIMS RESULTED IN CHARLOTTESVILLE POLICE DEPARTMENT OFFICERS FAILING TO INTERVENE AND PROTECT TURNER FROM AN ASSAULT BY THIRD PARTIES FAILS TO STATE A CLAIM OF ANY VIOLATION OF THE SUBSTANTIVE DUE PROCESS CLAUSE UNDER THE FOURTEENTH AMENDMENT.**

The alleged "special policy" (¶44) (**denied publicly by Chief Thomas and the City but which, in evaluating the City's 12(b)(6) Motion, the Court may be required to credit**) supposedly instituted by City of Charlottesville Police Chief Al Thomas, Jr. (¶44) in the middle of the night on

August 11, 2017 ordering his subordinate Charlottesville Police Department officers to "stand down" and not "intervene" with violent confrontation at the August 12, 2017 event between third parties (¶45) does not violate the substantive due process clause of the Fourteenth Amendment under *DeShaney v. Winnebago County Department of Social Services*, 489 U.S. 189 (1989) and *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995).

In *Doe 2 v. Rosa*, 795 F.3d 429 (4th Cir. 2015) (cert. denied *Doe v. Rosa*, 136 S.Ct. 811 (2016)), the Fourth Circuit reaffirmed that the City is not liable under the Fourteenth Amendment for the scenario cast by Turner in his Complaint under *DeShaney*. In *DeShaney*, a child's mother brought a §1983 action against a social worker and other officials on behalf of her child, who had been beaten and permanently brain damaged by his father. The mother alleged that the state officials failed to remove the child from his father's custody, despite repeated reports and evidence of the father's abuse, and that failure to act deprived the child of a liberty interest in violation of his due process rights. *DeShaney* at 191. In *Doe 2 v. Rosa*, the Fourth Circuit noted that in *DeShaney*, the United States Supreme Court rejected DeShaney's asserted federal constitutional cause of action under the Fourteenth Amendment stating that, "Nothing in the language of the due process clause itself requires the state to protect the life, liberty, property of its citizens against invasion by private actors. The clause is phrased as a limitation on the State's power to act, not as a guarantee of certain minimal levels of safety and security. It forbids the state itself to deprive individuals of life, liberty, or property without 'due process of law', but its language cannot fairly be extended to impose an affirmative obligation on the State to insure that those interests do not do harm through other means. Nor does history support such an expansive reading of the constitutional text. Like its counterpart in the Fifth Amendment, the Due Process Clause of the Fourteenth Amendment was intended to prevent government 'from abusing its power, or employing it as an instrument of oppression'. **Its purpose was to protect the people from the State, not to insure that the State protected them from each**

6

other." *Doe 2 v. Rosa* at 437 citing *DeShaney* at 195-196. (Emphasis supplied.) In *Doe 2 v. Rosa,* the Fourth Circuit reaffirmed that in *DeShaney*, the Court had established "a bright-line rule regarding due process causes of action involving the state-created danger doctrine. The Court concluded that because the 'Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the state cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them'". *Doe 2 v. Rosa* at 437, citing *DeShaney* at 196-197.

The Fourth Circuit noted, in *Doe 2 v. Rosa*, that, "Nonetheless, under *DeShaney*, state actor liability might attach in two **narrow circumstances**". *Doe 2 v. Rosa at 437*. (Emphasis added.) The first exception is when the state takes a person into its custody and holds them there against his will, it assumes some responsibility for a person's well-being. This exception is not applicable under the allegations in Turner's Complaint since he was not in custody at the time or restrained in any fashion by the state. In applying the second **narrow exception** to the *DeShaney* rule, the Fourth Circuit reaffirmed in *Doe 2 v. Rosa*, that the leading case in the Fourth Circuit defining the contours of the state-created danger doctrine is *Pinder v. Johnson*, 54 F.3d 1169 (4th Cir. 1995). *Doe 2 v. Rosa* at 438.

In *Pinder*, Ms. Pinder, the mother of three children, brought a §1983 action against a police officer who had responded to a report of domestic violence at her home. Her ex-boyfriend Pittman had broken into Pinder's home, assaulted her, and threatened to kill her and her three children. Pinder told the investigating officer that Pittman also had threatened her in the past and had just been released from jail for the attempted arson of her home. Fearing that Pittman could return to harm her or her children, she asked the officer whether she could safely return to work that evening. The officer assured her that Pittman would be incarcerated overnight on assault charges and could not be released until the County Commissioner became available for a hearing in the morning. With that assurance,

7

Pinder went to work that evening leaving her children at home. Instead of the assault charge, the officer filed lesser charges against Pittman, and he was released from custody that night. Pittman then returned to Pinder's home after she had gone to work and set it on fire. Pinder's children were sleeping inside, and all three died of smoke inhalation.

Pinder then brought a §1983 due process claim against the police officer. In *Doe 2 v. Rosa*, the Fourth Circuit reaffirmed its holding in *Pinder*, that Pinder could not side-step the broad rule in *DeShaney* by "characterizing her claim as one of affirmative misconduct by the state in 'creating or enhancing' the danger, instead of an omission". *Doe 2 v. Rosa* at 438. **In *Doe 2 v. Rosa*, the Fourth Circuit found that *DeShaney* and *Pinder* (like Turner's failure to intervene claim in this case) were both purely omission claims and found that such claims cannot survive scrutiny under *DeShaney*.** The Fourth Circuit, in *Pinder*, relied on its prior statement in *Pinder* that, "No amount of semantics can disguise the fact that the real 'affirmative act' here was committed by Pittman, not by Officer Johnson. As was true in *DeShaney*, the state did not 'create' the danger, it simply failed to provide adequate protection from it. In both cases, "The most that can be said of the state functionaries … is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *Pinder* at 1175-1176. In *Doe 2 v. Rosa*, the Fourth Circuit also reaffirmed that, "Under the **narrow limits** set by *DeShaney* and *Pinder* to establish §1983 liability based on a state created danger theory under the Fourteenth Amendment, a plaintiff must show that the state actor created or increased the risk of private danger, and did so directly through **affirmative acts, not merely through inaction or omission**. Put another way, 'state actors may not disclaim liability when they themselves throw others to the lions', but that does not 'entitle persons who rely on promises of aid to some greater degree of protection from lions at large.'" *Doe 2 v. Rosa* at 438-439. (Emphasis supplied.) Turner alleges no affirmative acts by the police ten feet away but, rather, specifically claims injuries

8

resulting from "inaction or omission" which is the antithesis of what is required under the second prong of the state created danger narrow exception to *DeShaney*.

Turner's claim in this case, like DeShaney's and Pinder's, does not allege affirmative misconduct on the part of Charlottesville Police Chief Thomas or any subordinate Charlottesville Police officers but merely inaction and a failure to intervene. Moreover, since under *Monell*, the "principles of *respondeat superior* does not apply to impose liability under §1983 on the City, Chief Thomas' own individual actions must have violated Turner's rights under the Fourteenth Amendment pursuant to a policy of the City of Charlottesville for it to be liable. *McWilliams v. Fairfax Cnty. Bd. of Supervisors*, 72 F.3d 1191, 1197 (4th Cir. 1996). As applicable to the allegations in Turner's Complaint, the Fourth Circuit also reaffirmed in *Doe 2 v. Rosa* that *DeShaney* makes clear that "allowing continued exposure to an existing danger by failing to intervene is not the equivalent of creating or increasing the risks of that danger". *Doe 2 v. Rosa* at 439. Turner's Complaint fails to state a plausible claim of any Fourteenth Amendment violation.

In *Doe 2 v. Rosa*, the Fourth Circuit stated, as applicable to the allegations in Turner's Complaint, that, "There simply is no constitutional right to be protected by the state against … criminals or mad men", and a state actor's "failure to do so is not actionable under §1983". To paraphrase *Pinder*, "No amount of semantics can disguise the fact that the real 'affirmative act' here was committed by someone else. As was true in *DeShaney*, the state did not 'create' the danger, it simply failed to provide adequate protection from it." *Doe 2 v. Rosa* at 440, citing *Pinder* at 1175.

Just as in *Doe 2 v. Rosa* and *Pinder*, Turner's claim fails because the danger presented to him by the alleged White Supremacists at the August 12, 2017, which he voluntarily attended, was not the result of any affirmative act or "policy" by the City or the individual actions of its police chief. The danger presented to Turner as a counter protestor was created by third party alleged White Supremacists who he claims attacked him, not the Charlottesville Police Chief or a claimed non-

9

intervention "special policy". As reaffirmed in *Doe 2 v. Rosa*, a "key requirement" for liability under the state-created danger doctrine is that the state actor increase or create the danger through "affirmative conduct". Turner alleges no such affirmative conduct and, in fact, bases his entire attempted Fourteenth Amendment claim on the antithesis of affirmative conduct, i.e., an alleged "failure to intervene". *Doe 2 v. Rosa* at 440. Allegations by Turner that City police officers stood by ten feet away and did nothing are insufficient to state a claim under the second prong of the state-created danger narrow exception doctrine since, as a matter of law, they do not constitute "affirmative acts" necessary to support a 14th Amendment substantive due process claim.

In *Pinder*, the Fourth Circuit also held that the Supreme Court in *DeShaney* specifically rejected the 'shocks the conscience' test of *Rochin v. California*, 342 U.S. 165, 172 (1952) as a basis of imposing §1983 liability in the affirmative duty context. *Pinder* at 1178, citing *DeShaney* at 198-198.

In *Doe 4 v. Rosa*, 664 Fed.Appx. 301 (4th Cir. 2016), applying its holding in *Doe 2*, the Fourth Circuit held that the general public, of which Turner was a part at the August 12, 2017 "Rally", is not a precisely definable group and the state created danger exception to the *DeShaney* rule does not even apply. *Doe 4* at 303. In support of its holding, the Court cited a Sixth Circuit case, *Jones v. Reynolds,* 438 F.3d 685, 697-98 (6th Cir. 2006) (holding that a group of at least 150 spectators at a drag race was too large and unidentified for the state created danger doctrine to apply). In *Doe 4*, the Fourth Circuit also reiterated "its holding in *Doe 2* that "immediate intervention between the state actor and the plaintiff 'are a required nexus for the state created danger doctrine to apply. Turner alleges no interaction with Chief Thomas or the City at the Rally where he was but one of an unidentified number of counter-protesters and White Supremacists.

In *Keitz v. Unnamed Sponsors of Cocaine Research Study*, 829 F.Supp.2d 374 (W.D.Va. 2011), Judge Conrad noted that when Keitz voluntarily participated in the University of Virginia care

10

drug study in that case after willfully applying for and gaining admission to the program he could not allege that the University of Virginia created the danger that resulted in his harm. Similarly, in this case, Turner cannot allege that his claimed policy by the City's police chief created his harm where he voluntarily attended the rally to protest against alleged White Supremacists. Moreover, in *Kietz*, the District Court, cited *Slaughter v. Mayor & City Council of Baltimore,* 757 F.Supp.2d 548, 553-554 (D.Md. 2010), and held that, "The Fourth Circuit has been careful, however, to limit the state created danger exception to cases in which the state has compelled the injured person to encounter the danger … If the employee voluntarily encounters the risk, the exception does not apply." In *Keitz*, the Court, as applicable to Turner's Complaint, found that the theory behind the state-created doctrine "is that a state actor should only be liable when that actor affirmatively puts a victim in harm's way without giving the victim a choice about whether to face the peril. Turner alleges no such scenario.

Under *Pinder, Doe 2*, and *Keitz,* the second prong of the state created danger narrow exception to *DeShaney* does not apply to the assault against him by third party White Supremacists alleged by Turner in his Complaint and fails to state a plausible claim of any Fourteenth Amendment substantive due process violation.

### THE "SPECIAL POLICY" (WHICH TURNER ADMITS HAS BEEN PUBLICLY DENIED) RELIED ON BY TURNER, ALLEGEDLY INITIATED BY THE CHIEF OF POLICE THE NIGHT BEFORE THE AUGUST 12, 2017 "RALLY", IS NOT ACTIONABLE UNDER *MONELL* AGAINST THE CITY.

Turner claims that City of Charlottesville Police Chief Al Thomas, Jr.'s "initiated" a one-time specific "stand down" order (Doc #1, ¶45) "special policy" (Doc #1, ¶42) on the eve of the August 12, 2017 Rally". He admits in his Complaint that Chief Thomas has publicly denied initiating the policy alleged by Turner. The postulated policy which, even if it existed, does not violate the Fourteenth Amendment for the reasons set forth above. In any event, it is not attributable to

Charlottesville under *Monell v. New York Department of Social Services,* 436 U.S. 658 (1978), since pursuant to the Charter for the City of Charlottesville, Chief Thomas is not the "final policy maker". The Charter for the City of Charlottesville is a public record which is available to the public through charlottesville.org. The Charter can be relied on by this Court in ruling on the Rule 12(b)(6) F.R.C.P. motion. *Phillips v. Pitt City. Mem'l. Hospital,* 572 F.3d 176, 180 (4th Cir. 2009), *Hall v. Virginia,* 385 F.3d 421, 424 (4th Cir. 2004).

In his Complaint, Turner acknowledges that "Notably", Defendant Al Thomas, Jr., Chief, Charlottesville Police Department, has publicly denied issuing the "stand down" order, as described by Turner in his Complaint (¶45), upon which Turner relies as the basis for his attempted Fourteenth Amendment claim against Chief Thomas and then as an actionable municipal "policy" under *Monell* against the City of Charlottesville (Doc #1, p. 2 & 4). In the Complaint with respect to the alleged policy Turner attempts to attribute to the City of Charlottesville under *Monell*, he states as a fact that, "As Chief of the Charlottesville Police Department, Al Thomas, Jr. reported directly to the City Manager" (Doc #1, ¶3). Turner then goes on to allege, in conclusory fashion, that, "At all times relevant, Chief Thomas was the policy maker for the City of Charlottesville **with respect to** crowd control and roti (sic) control regarding First Amendment protest held within the City limits, including Emancipation Park" (Doc 1, ¶3). (Emphasis added.) Turner further alleges that, "Chief Thomas was in charge of police planning, operations, and response on Saturday, August 12, 2017" (Doc 1, ¶38) and that, "In his own words, Chief Thomas 'was the commander for this incident' and 'oversaw the operation and was the final say'" (Doc #1, ¶39, 47, 48). Turner then alleges that, "Chief Thomas was enraged by this Court's ruling that required the City to reissue the permit for Kessler to hold the rally in Emancipation Park because Thomas has pushed for the rally to be held in the alternative location of McIntyre Park" (Doc 1, ¶40). Turner does not allege that the police chief was the "final policy maker".

12

The Court record in *Kessler v. City of Charlottesville,* Civil Action No. 3:17CV00056, reflects that the Court issued its ruling and Order enjoining the City from revoking Kessler's permit to conduct a demonstration at Emancipation Park on August 12, 2017 the evening of August 11, 2017. Turner alleges that Chief Thomas then took it upon himself to institute a "special policy" (Doc 1, ¶44). He claims that Chief Thomas was personally "enraged" by the Court's ruling and wanted to prove that "he was in the right" (¶42). Turner goes on to allege, with respect to the "stand down" order/policy that he attempts to attribute to Charlottesville, that, "Specifically, Chief Thomas ordered Charlottesville City Police to refrain from intervening in any violent confrontations between white supremacists and counter-protesters unless given a direct command to do so" (Doc 1, ¶45).

The Complaint does not allege that the City Manager, to whom Turner acknowledges Chief Thomas reported, ever reviewed or approved the claimed middle of the night, anger fueled "special policy" that Chief Thomas allegedly instituted in conjunction with Co-Defendant Flaherty from the Virginia State Police or that he was "the final policy maker" for the City of Charlottesville.

As a matter of state law, pursuant §5(b) of the City of Charlottesville Charter granted by the Virginia General Assembly, "The form of government for said City shall be the City Manager plan as follows 'All corporate powers, legislative and executive authority vested in the City of Charlottesville by law shall be and are hereby vested in a Council of five members to be elected at large from the qualified voters of the City except as hereinafter provided". In §5(f), the Charter specifically provides, that subject to the general control of Council, that, "The City Manager shall have full executive and **administrative authority** and shall have the right to employ and discharge all employees under his control". (Emphasis supplied.) The subsection goes on to specifically provide that, "All departments of the City Government, including … **the police department shall be under the general supervision of the City Manager**". (Emphasis supplied.) Pursuant to §2-146 of the Charlottesville City Code, the City Manager is the Chief Executive and Administrative Officer of

13

the City Government and is in charge of enforcing the laws of the City. The City Manager is the Director of Public Safety, with general supervision over the Police Department of the City.

Under *Monell v. New York Department of Social Services,* 436 U.S. 658 (1978), the City of Charlottesville cannot be held liable under the theory of *respondeat superior* §1983 for constitutional violations caused by any of its employees. *Pembaur v. City of Cincinnati*, 475 U.S. 469, 478 (1986). Under *Monell*, it can only be liable if the municipality causes a constitutional tort "through an official policy or custom". *Pachaly v. City of Lynchburg,* 897 F.2d 723 (4th Cir. 1990); *Pembaur* at 477. In *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003), the Fourth Circuit noted that, "A policy or custom for which a municipality may be held liable in a §1983 action can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with **final policy making authority**; (3) through an omission such as a failure to properly train officers, that 'manifest deliberate indifference to rights of citizens'; or (4) through a practice that is so 'persistent and widespread' to constitute a 'custom or usage with the force of law'". (Emphasis supplied.) *Lytle* at 471; see also *City of St. Louis v. Praprotnik*, 485 U.S. 112, 123-125 (1988). Under the facts pled by Turner in his Complaint, the only potential path to a *Monell* claim against the City of Charlottesville is through the second method set forth in *Lytle* since Turner does not allege any express policy, written ordinance or regulation and only alleges a one-time "special policy". Aside from the fact that the "policy/order" Turner relies on was a "special policy" (¶44) initiated by an alleged enraged police chief in the middle of the night on the eve of the August 12, 2017 event (all of which is the polar opposite of any official policy), Turner does not allege in his Complaint that the City Manager either supervised, approved, or delegated to him the authority to establish as the final policy maker the claimed spur of the moment, anger generated policy under which he attempts to attribute municipal liability under *Monell* to the City of Charlottesville. He never alleges that the police chief was the final policy maker under state law. See *Stickley v. Sutherly,* 416 Fed.Appx. 268

(4th Cir. 2011) (finding no municipal liability under *Monell* where Plaintiff failed to show that the police chief or city manager had final authority under the Strasburg Town Code to establish municipal policy with respect to the action ordered). Under *Pembaur*, municipal liability only attaches where the decision maker possesses **final authority** to establish municipal policy with respect to the action ordered and resolution of that issue is governed by state law. *Pembaur* at 481-483. Pursuant to the City of Charlottesville Charter, the City Manager, not the Police Chief, is the final authority.

In *Cranford v. Kluttz,* 2017 U.S.Dist. LEXIS 162018 (M.D.N.C. 2017), the district court noted, citing *Lytle*, that a municipal liability may only arise through decisions of a person with final policy making authority. The district court, in *Cranford*, citing *City of St. Louis v. Praprotnik*, 485 U.S. 112, 124-125 (1988), noted again that the identification of policymaking officials is a question of state law. The Court then went on to note, such as the case here, that, "If an official's acts are subject to review or supervision by a municipal policy maker, that official does not have final policymaking authority". *Alexander v. City of Greensboro*, 762 F.Supp.2d 764, 783 (M.D.N.C. 2011) (citing *Riddick v. Sch. Bd.*, 238 F.3d 518, 523-524 (4th Cir. 2000)). In *Alexander*, the District Court held that, "While it is true that Plaintiffs only need to establish a prima facie case at this stage, HN8 *Iqbal* and *Twombly* require more than claims from which mere possibility can be inferred; they require facts showing plausibility. Plaintiffs have not met this standard. See *Yadin Co. v. City of Peoria,* No. CV-06-1317-PHX-PGR, 2008 U. S. Dist. LEXIS 109501, 2008 WL 906730, at *5 (D. Ariz. Mar. 25, 2008) (dismissing section 1983 claim for lack of factual allegations [**24] supporting plaintiff's assertion that a city official had final policymaking authority or had been delegated such authority".

Pursuant to the City of Charlottesville Charter, Turner's claimed middle of the night stand down order by Chief Thomas, which Turner acknowledges has been publicly denied, even if it violated the Fourteenth Amendment, which, as previously argued, does not, cannot subject the City of Charlottesville to potential liability under *Monell* since, under the Charlottesville City Charter,

15

Chief Thomas' alleged policy/order was subject to supervision by the City Manager. He did not have final policymaking authority; and the police chief's alleged "special policy" is not actionable against the City under *Monell* assuming, which it does not, that the "special policy" violates substantive due process under the Fourteenth Amendment.

WHEREFORE, the City of Charlottesville, Virginia, by counsel, moves the Court to grant its Motion to Dismiss, with prejudice, Count III and Count VI of the Complaint, which are the only Counts in the Complaint Turner attempts to allege against it.

CITY OF CHARLOTTESVILLE, VIRGINIA<br>By Counsel

s/Richard H. Milnor
Richard H. Milnor, Esquire (VSB #14177)
John W. Zunka, Esquire (VAB #14368)
Zunka, Milnor & Carter, Ltd.
414 Park Street
P O Box 1567
Charlottesville VA 22902
Telephone: (434) 977-0191
Facsimile: (434) 977-0198
rmilnor@zmc-law.com
jzunka@zmc-law.com

**CERTIFICATE OF SERVICE**

I hereby certify that on the 1st day of November, 2017, I electronically filed the foregoing Answer with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the following:

Jessica Serman Stoltz, Esquire
Nexus Caridades Attorneys, Inc.
113 Mill Place Parkway   Suite 105A
Verona VA 24482
jstoltz@nexuscaridades.com
*Co-Counsel for Robert S. Turner*

Mario B. Williams, Esquire
Nexus Caridades Attorneys, Inc.
44 Broad Street NW   Suite 200
Atlanta GA 30303
mario@goodgeorgialawyer.com
mwilliams@ nexuscaridades.com
*Co-Counsel for Robert S. Turner*

Rita P. Davis
Senior Assistant Attorney General/Chief
Office of the Virginia Attorney General
202 North 9th Street
Richmond VA 23219
RPDavis@oag.state.va.us
*Co-Counsel for W. Steven Flaherty*

Erin R. McNeill
Assistant Attorney General
Office of the Virginia Attorney General
202 North 9th Street
Richmond VA 23219
emcneill@oag.state.va.us
*Co-Counsel for W. Steven Flaherty*

David P. Corrigan, Esquire
M. Scott Fisher, Esquire
Harman, Claytor, Corrigan & Wellman
4951 Lake Brook Drive Suite 100
Glen Allen VA 23060
dcorrigan@hccw.com
sfisher@hccw.com
*Counsel for Al Thomas, Jr.*

s/Richard H. Milnor