CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
May 29, 2018
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION

ROBERT SANCHEZ TURNER,

               *Plaintiff,*

v.

AL THOMAS, JR., *ET AL.*,

               *Defendants.*

CASE NO. 3:17-CV-00064

MEMORANDUM OPINION

JUDGE NORMAN K. MOON

This case is before the Court on Defendants' motions to dismiss pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6). Plaintiff Robert Sanchez Turner ("Turner") alleges several claims for damages sustained at the August 12, 2017 "Unite the Right" rally. These claims are asserted against Defendants Al Thomas Jr. ("Thomas"), former Chief of the Charlottesville Police Department; W. Stephen Flaherty ("Flaherty"), Virginia State Police Superintendent; and the City of Charlottesville ("Charlottesville"). Plaintiff's claims share a common question: whether there is constitutional duty under the Fourteenth Amendment for the police to intervene to protect a citizen from criminal conduct by third parties. Because I find this duty is not "clearly established," his claims are barred by qualified immunity. Therefore, although Defendant Flaherty's jurisdictional argument under Rule 12(b)(1) fails, Defendants' motions to dismiss pursuant to Rule 12(b)(6) will be granted.

## I. Standard of Review

Defendants bring motions pursuant to Federal Rule of Civil Procedure 12(b)(1) and 12(b)(6). A motion to dismiss under Rule 12(b)(1) challenges the Court's subject matter jurisdiction. The burden of proving subject matter jurisdiction rests upon the plaintiff. *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir. 1982). Thus, a court must dismiss a complaint which fails to

allege facts that demonstrate subject matter jurisdiction.[1] *Id.*

"In ruling on a 12(b)(6) motion, a court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in favor of the plaintiff." *Kensington Volunteer Fire Dep't, Inc. v. Montgomery Cty., Md.*, 684 F.3d 462, 467 (4th Cir. 2012); *see also Erickson v. Pardus*, 551 U.S. 89, 94 (2007). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal citations and quotation marks omitted). Stated differently, in order to survive a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570).

## II.  Facts as Alleged

In Charlottesville, Virginia, a statue of Confederate General Robert E. Lee stands in what was formerly called "Lee Park." (Compl. ¶¶ 6–8). In June 2017, Defendant Charlottesville changed the park's name to "Emancipation Park," ("the Park") and subsequently planned to sell the statue and have it removed. (*Id.* ¶ 7–8). In response, Jason Kessler, leader of the group "Unity & Security for America," organized the "Unite the Right" rally to protest the Park's name change and the decision to sell the statute. (*Id.* ¶ 10–11).

---

[1]     Motions to dismiss for lack of subject matter jurisdiction can be brought one of two ways: "First, it may be contended that a complaint simply fails to allege facts upon which subject matter jurisdiction can be based." *Adams*, 697 F.2d at 1219. "Second, it may be contended that the jurisdictional allegations of the complaint were not true." *Id.* Implicated here is only the first (*i.e.,* facial) challenge to subject matter jurisdiction. As such, "all the facts alleged in the complaint are assumed to be true and the plaintiff, in effect, is afforded the same procedural protection as he would receive under a Rule 12(b)(6) consideration." *Id.*

Kessler applied for, and was granted, a permit to hold a "free speech rally in support of the Lee monument" by the City. (*Id.* ¶ 12). Less than a week before the event, the City revoked Kessler's permit, citing traffic and safety concerns. (*Id.* ¶¶ 15–16, 21, 29). Allegedly, Kessler was initially promised that security measures would nevertheless remain in place for the revoked event. However, he was later informed that Defendant Thomas, as Chief of Police, allegedly "changed his mind" and would not provide any of the initially promised protections. (*Id.* ¶ 30).

Kessler then brought suit, challenging the permit's revocation on First and Fourteenth Amendment grounds, seeking injunctive relief. (*Id.* ¶ 32). U.S. District Judge Glen Conrad granted Kessler's request and reinstated the permit. *Kessler v. Cty. of Charlottesville, Virginia*, No. 3:17CV00056, 2017 WL 3474071 (W.D. Va. Aug. 11, 2017). Turner alleges that in response to Judge Conrad's ruling, Defendants Thomas and Flaherty became "enraged," and instituted a "special policy" for the protest, "ordering [their] officers to 'stand down' . . . ." (*Id.* ¶¶ 40–41, 44). This alleged "stand down" order mandated law enforcement to: "refrain from intervening in any violent confrontations between white supremacists and counter-protesters unless given a command to do so." (*Id.* ¶¶ 44–46). Turner alleges law enforcement followed this "stand down" order and even directly told counter-protesters they would "not intervene unless given a command to do so." (*Id.* ¶¶ 49–50).

It is alleged that on August 12, 2017, Turner went to the Park as a counter-protestor. (*Id.* ¶¶ 9–10, 52–53). As he allegedly protested peacefully on the sidewalk adjacent to the Park, "KKK members/sympathizers" exited the Park and began "to engage counter protesters who were on the sidewalk." (*Id.* ¶ 57). Police allegedly looked on as protesters, unprovoked, sprayed Turner in his eyes with mace, subsequently beat him with a stick, and threw bottles of urine at him. (*Id.* ¶¶ 54–55, 59, 64). He alleges that "Charlottesville Police and Virginia State Patrol

officers stood and watched [this] for more than thirty seconds, while doing nothing to intervene."

(*Id.* ¶¶ 58, 61–63).[2]

Turner now asserts several claims against Defendants premised on what is known as a "state-created danger" theory of liability. *See generally DeShaney v. Winnebago Cty. Dep't of Soc. Servs.*, 489 U.S. 189 (1989). Turner alleges Defendants Thomas and Flaherty, in their individual capacities, violated his substantive due process rights by failing to intervene in a state-created danger, under both direct (Count I) and supervisory (Count II) theories of liability. He also alleges Defendants acted with "deliberate indifference" towards his assault (Count IV) in violation of the Fourteenth Amendment. Lastly, he alleges that municipal liability extends to Defendant Charlottesville for violating his substantive due process rights (Count III). *See generally Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658 (1978). Turner also seeks punitive damages (Count V) and attorney's fees (Count VI).

### III.  Subject Matter Jurisdiction

Defendant Flaherty, as superintendent of the Virginia State Police, contends sovereign immunity bars the claims against him. Specifically, he argues the Court lacks subject matter jurisdiction over the supervisory liability claim, since it was alleged against him in his official capacity. (Dkt. 27 at ECF 12).

"[A] suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office. As such, it is no different from a suit

---

[2]    After the incident in question, an unlawful assembly was declared and "police left the scene to change into riot gear." (*Id.* ¶ 70). Plaintiff alleges that Defendants Thomas and Flaherty "ordered their subordinates not to show up in riot gear despite" a warning by the Department of Homeland Security three days before the rally that the rally would be violent. (*Id.* at ECF 2, ¶ 70). Once equipped with riot gear, the "police began to 'clear' the Park, forcing all of the white supremacists . . . directly into the crowd of counter-protesters." (*Id.* ¶ 71). This "funneling" allegedly resulted in "multiple other violent attacks and severe injuries." *Id.* However, the injuries alleged by Plaintiff here occurred before this alleged "funneling" took place.

against the State itself." *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 71 (1989) (citation

omitted). Section 1983 "does not provide a federal forum for litigants who seek a remedy against

a State for alleged deprivations of civil liberties. The Eleventh Amendment bars such suits . . . ."

*Id.* at 66. *See also Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44, 64 (1996) ("[T]he Eleventh

Amendment [stands] for the constitutional principle that state sovereign immunity limit[s] the

federal courts' jurisdiction under Article III.").[3] Unlike official capacity suits, suits brought

against defendants in their individual capacities do not implicate sovereign immunity, as they

"seek to impose *personal* liability upon a government official for actions he takes under color of

state law." *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985) (emphasis added).

Here, Turner specifically alleges in his Complaint that each claim is against Defendants

Thomas and Flaherty in their "individual capacities." (Dkt. 1 at ECF 26–30). This express

pleading is conclusive as to the capacity of Plaintiff's claims. *Biggs v. Meadows*, 66 F.3d 56, 61

(4th Cir. 1995) (holding that capacity can only be determined by the court when not specifically

alleged in the complaint). Since the claims are against Defendants in their individual—and not

official—capacities, Eleventh Amendment immunity is not implicated, and the Court has subject

matter jurisdiction. Therefore, Defendant Flaherty's motion to dismiss under 12(b)(1) will be

denied.

## IV.    Qualified Immunity

The individual Defendants argue they are entitled to qualified immunity, a doctrine that

protects government officials from damages lawsuits when their actions did not violate clearly

---

[3]    "In effect, the Eleventh Amendment limits the ability of a federal district court to
exercise its subject-matter jurisdiction over an action brought against a state or one of its entities.
Although not a true limit on the subject-matter jurisdiction of the federal courts, the Eleventh
Amendment is 'a block on the exercise of that jurisdiction.'" *Roach v. W. Virginia Reg'l Jail &
Corr. Facility Auth.*, 74 F.3d 46, 48 (4th Cir. 1996) (quoting *Biggs v. Meadows,* 66 F.3d 56, 60
(4th Cir. 1995)).

established law. Turner alleges Defendants Thomas and Flaherty deprived him of substantive

due process under the Fourteenth Amendment by issuing "stand down" orders to their officers.

These preemptive orders, he argues, resulted in law enforcement's failure to intervene to protect

him from injuries at the hands of third party criminal actors, advancing what is known as a

"state-created danger" theory of liability.

When determining whether a claim is barred by qualified immunity, the Court must

"decide whether the right at issue was 'clearly established' at the time of defendant's alleged

misconduct." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). In conducting the clearly

established analysis, courts "first examine . . . decisions of the Supreme Court, [the Court of

Appeals for the Fourth Circuit], and [the Supreme Court of Virginia]. We ordinarily need not

look any further than decisions from these courts."[4] *Booker v. S.C. Dep't of Corr.*, 855 F.3d 533,

538–39 (4th Cir. 2017) (citations and quotation marks omitted). In determining whether a right is

clearly established, it is not required that a case be directly on point. *Mullenix v. Luna*, 136 S. Ct.

305, 308 (2015). Rather "existing precedent must have placed the statutory or constitutional

question beyond debate." *Id.* Such "clearly established" rights should not be defined "at a high

level of generality," but "must be 'particularized' to the facts of the case." *White v. Pauly*, 137 S.

Ct. 548, 552 (2017). "The dispositive question is 'whether the violative nature of *particular*

conduct is clearly established.'" *Mullenix*, 136 S. Ct. at 308 (quoting *Ashcroft v. al-Kidd*, 563

U.S. 731, 742 (2011)) (emphasis in original); *see also Hope v. Pelzer*, 536 U.S. 730, 741 (2002)

(holding defendants "can still be on notice that their conduct violates established law even in

novel factual circumstances," so long as the law provided "fair warning" that their conduct was

---

[4]     "But when there are no such decisions from courts of controlling authority, [courts] may
look to 'a consensus of cases of persuasive authority' from *other jurisdictions*, if such exists."
*Booker*, 855 F.3d at 538–39 (emphasis in original). No such consensus of persuasive authority is
implicated here.

unconstitutional).

Below, each claim will be analyzed to determine whether it is supported by a clearly established constitutional right. I find that they are not, and hold that Plaintiff's claims against Defendants Thomas and Flaherty are barred by qualified immunity.

## A.    Count I: Failure to Intervene in a State-Created Danger

"[T]he Due Process Clause[] generally confer[s] no affirmative right to governmental aid, even where such aid may be necessary to secure life, liberty, or property interests of which the government itself may not deprive the individual. . . ." *DeShaney*, 489 U.S. at 196. "If the Due Process Clause does not require the State to provide its citizens with particular protective services, it follows that the State cannot be held liable under the Clause for injuries that could have been averted had it chosen to provide them." *Id.* at 196–97. Thus, "a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Id.* at 197.

Nonetheless, an "affirmative act" by the state—"not its failure to act to protect [a plaintiff's] liberty interests against harms inflicted by other means"—can be a deprivation of liberty which triggers "the protection of the Due Process Clause." *Id.* at 200. This "affirmative act" exception to the general rule of nonliability is known as the state-created danger doctrine.[5]

"[T]o establish § 1983 liability based on a state-created danger theory, a plaintiff must show [1] that the state actor created or increased the risk of private danger, and [2] did so directly

---

[5]    Another exception to the general rule of nonliability occurs when a "special relationship" exists between the plaintiff and the state—such as when "the state restrains persons from acting on their own behalf." *Pinder v. Johnson*, 54 F.3d 1169, 1174 (4th Cir. 1995). While the Fourth Circuit acknowledged the narrow "special relationship" exception could apply outside the "traditional custodial context," it emphasized that such an affirmative duty was a manifestation merely of "the proposition that state actors may not disclaim liability when they themselves throw others to the lions . . . ." *Id.* However, because Plaintiff does not alleged that he was in custody, or that any special relationship existed between him and the state, this exception is not implicated here.

through affirmative acts, not merely through inaction or omission." *Doe v. Rosa*, 795 F.3d 429, 439 (4th Cir. 2015). "'Affirmative acts,' in the state-created danger context, are quite limited in scope." *Id.* at 441. "It cannot be that the state 'commits an affirmative act' or 'creates a danger' every time it does anything that makes injury at the hands of a third party more likely. If so, the state would be liable for every crime committed by the prisoners it released." *Pinder*, 54 F.3d at 1173 (citing *Martinez v. California,* 444 U.S. 277, 284–85 (1980)). "While it is true that inaction can often be artfully recharacterized as 'action,' courts should resist the temptation to inject this [state-created danger] framework into omission cases by stretching the concept of 'affirmative acts' beyond the context of immediate interactions between the officer and the plaintiff." *Id.* at 1176, n.*.

In *Pinder*, the plaintiff brought a § 1983 action against a police officer and a city commissioner after her former boyfriend murdered her three children. *Id.* at 1172. The night of the murders, police responded to a domestic disturbance call at the plaintiff's home. *Id.* Upon the officer's arrival, the boyfriend was arrested and placed in a squad car. *Id.* Plaintiff informed the officer that the boyfriend "had threatened her in the past, and that he had just been released from prison after being convicted of attempted arson at [the plaintiff's] residence some ten months earlier." *Id.* The plaintiff communicated that she was afraid for the safety of her three children, but was assured by the officer that the boyfriend would be locked up overnight, and the plaintiff returned to work. *Id.* That same night, the boyfriend was charged with misdemeanor offenses and released with instructions to stay away from the plaintiff's home. *Id.* Disregarding the instructions, the boyfriend returned to the plaintiff's home and set fire to it. *Id.* All three children died of smoke inhalation. *Id.* The plaintiff brought suit against the police officer and the county commissioner claiming, *inter alia*, that they had violated their affirmative duty under the

Fourteenth Amendment to protect her and her children. *Id.*

Relying upon the Supreme Court's decision in *DeShaney*,[6] the Fourth Circuit held the plaintiff's claim was barred by qualified immunity, as she could point to "no clearly established law supporting her claim at the time of the alleged violation." *Id.* at 1173. The court addressed, *inter alia*, the plaintiff's argument that the state engaged in "affirmative conduct" creating or enhancing the danger. *Id.* ("She emphasize[d] the 'actions' that [the defendant] took in making assurances, and in deciding not to charge [the boyfriend] with any serious offense."). The court found the only the party who committed the affirmative act was the boyfriend—not the police. *Id.* The court reasoned that, "[a]s was true in *DeShaney,* the state did not 'create' the danger, it simply failed to provide adequate protection from it. In both cases, '[t]he most that can be said of the state functionaries . . . is that they *stood by and did nothing when suspicious circumstances dictated a more active role* for them.'" *Id.* at 1175–76 (quoting *DeShaney*, 489 U.S. at 203) (emphasis added).

Here, Turner argues Defendants affirmatively acted by issuing the "stand down" order.

---

[6]     The Fourth Circuit in *Pinder* succinctly recounted the Supreme Court's decision in *DeShaney*:

> The facts in *DeShaney* were as poignant as those in this case. There, the Winnebago County Department of Social Services (DSS) received a number of reports that a young boy, Joshua DeShaney, was being abused by his father. As this abuse went on, several DSS workers personally observed the injuries that had been inflicted on Joshua. They knew firsthand of the threat to the boy's safety, yet they failed to remove him from his father's custody or otherwise protect him from abuse. Ultimately, Joshua's father beat him so violently that the boy suffered serious brain damage. Joshua's mother brought a § 1983 action on his behalf, arguing that the County and its employees had deprived Joshua of his liberty interests without due process by failing to provide adequate protection against his father's violent acts. Despite natural sympathy for the plaintiff, the Court held that there was no § 1983 liability under these circumstances.

*Pinder*, 54 F.3d at 1174 (citations omitted).

However, like the boyfriend in *Pinder*, the only individuals who engaged in affirmative conduct were the third party criminal actors—not the Defendants or their subordinates. Looking to the "immediate interactions between the officer and the plaintiff," *Pinder*, 54 F.3d at 1176, n.*, Turner has not alleged Defendants did anything to "directly" cause his injuries. Rather, he alleges the "Charlottesville Police and Virginia State Patrol officers stood and watched [the assault] for more than thirty seconds, while doing nothing to intervene." (Compl. ¶ 61). Turner does allude to active conduct by the police when they allegedly cleared out the park and "funneled" protesters into counter-protesters. (Compl. ¶¶ 52–69, 71). However, this allegedly occurred *after*, not before, he sustained his injuries. There was simply no affirmative act by police that created the danger that befell Plaintiff. Framing the incident in terms of a "stand down" order is nothing more than an "artful recharacterization" of inaction as action—something the Fourth Circuit in *Pinder* warned was inappropriate.

Ultimately, the Fourth Circuit has never issued a published opinion finding a successful "state-created danger" claim. *See Doe v. Rosa*, 795 F.3d 429 (4th Cir. 2015) (holding no claim existed where college president allegedly knew of, failed to report, and tried to conceal the fact that a child molester had continued to work at a college's summer kids camp); *Waybright v. Frederick Cty., MD*, 528 F.3d 199, 201 (4th Cir. 2008) (finding no violation for failure to prepare for and treat firefighter trainee's medical needs); *Pinder*, 54 F.3d at 1169. Turner's argument there was "clear fair warning" that such a "stand down" order violated clearly established law, (dkt. 34 at ECF 28), collapses under the weight of controlling precedent finding there is generally no duty to intervene, as well as Turner's inability to identify any U.S. Supreme Court, published Fourth Circuit, or Supreme Court of Virginia precedent recognizing a valid state-created danger claim.

The Fourth Circuit has explained why qualified immunity is so important in this type of case:

> The recognition of a broad constitutional right to affirmative protection from the state would be the first step down the slippery slope of liability. *Such a right potentially would be implicated in nearly every instance where a private actor inflicts injuries that the state could have prevented.* Every time a police officer incorrectly decided it was not necessary to intervene in a domestic dispute, the victims of the ensuing violence could bring a § 1983 action. . . . Indeed, victims of virtually every crime could plausibly argue that if the authorities had done their job, they would not have suffered their loss. Broad affirmative duties thus provide a fertile bed for § 1983 litigation, and the resultant governmental liability would wholly defeat the purposes of qualified immunity.

*Pinder*, 54 F.3d at 1178 (emphasis added). Given that warning, as well as the great weight of binding precedent surveyed above, I find the alleged constitutional right asserted by Plaintiff against Defendants Thomas and Flaherty was not clearly established at the time of Defendants' inaction.

Accordingly, Count I is barred by qualified immunity.

**B.      Count II: Supervisory Liability**

To state a supervisory liability claim under § 1983, Plaintiff must satisfy three elements:

> (1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed "a pervasive and unreasonable risk" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994) (collecting cases); *Wilkins v. Montgomery*, 751 F.3d 214, 226 (4th Cir. 2014). As to the second prong of *Shaw*, "a plaintiff '[o]rdinarily . . . cannot satisfy his burden of proof by pointing to a single incident or isolated incidents . . . for a supervisor cannot be expected . . . to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.'" *Randall v.*

*Prince George's Cty., Md.*, 302 F.3d 188, 206 (4th Cir. 2002) (quoting *Slakan v. Porter,* 737 F.2d 368, 373 (4th Cir. 1984)).

Under *Shaw*, Plaintiff must make a double showing: (1) whether supervisory liability under § 1983 was clearly established at the time of the incident; and (2) whether the alleged underlying constitutional violation was also clearly established. Here, while supervisory liability in the § 1983 context is clearly established, *id.* at 801, the constitutional violation undergirding his allegation of supervisory liability is not. As demonstrated above, *see supra* Part IV.A, the right he asserts, based on a state-created danger theory, was not clearly established at the time of the August 12, 2017 rally. To the contrary, there is simply no constitutional right to state protection from "criminals or madmen," and a state official's failure to provide such protection "is not actionable under § 1983." *Doe*, 795 F.3d at 440.

Accordingly, Count II is barred by qualified immunity.[7]

## C.     Count IV: Deliberate Indifference

Plaintiff's also asserts claims against Defendants Thomas and Flaherty for deliberate indifference in violation of Plaintiff's Fourteenth Amendment rights. "'The touchstone of due process is protection of the individual against arbitrary action of government,' whether the fault lies in a denial of fundamental procedural fairness or in the exercise of power without any reasonable justification in the service of a legitimate governmental objective." *Cty. of Sacramento v. Lewis*, 523 U.S. 833, 845 (1998) (citations omitted) (quoting *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974)). "[I]n a due process challenge to executive action, the threshold question is whether the behavior of the governmental officer is so egregious, so outrageous, that

---

[7]     Plaintiff's claim would also fail on the merits. Turner's failure to successfully plead a state-created danger claim directly against Defendants forecloses on an opportunity to find such liability on a supervisory theory. *Doe v. Rosa*, 664 F. App'x 301, 303 n.2 (4th Cir. 2016) (noting there can be no supervisory liability when there is no underlying violation of the Constitution).

it may fairly be said to shock the contemporary conscience." *Id.* at 833 n.8. This "shocks the conscience" element is distinct from a "deliberate indifference" standard. *Sanford v. Stiles*, 456 F.3d 298, 310 (3d Cir. 2006) ("We again clarify that in *any* state-created danger case, the state actor's behavior must *always* shock the conscience. But what is required to meet the conscience-shocking level will depend upon the circumstances of each case, particularly the extent to which deliberation is possible. In some circumstances, deliberate indifference will be sufficient. In others, it will not.") (emphasis in original). The Fourth Circuit has acknowledged that, outside of situations involving custody, "the Supreme Court has never applied a 'deliberate indifference' standard merely because the State created a danger that resulted in harm." *Slaughter v. Mayor & City Council of Baltimore*, 682 F.3d 317, 321 (4th Cir. 2012) (analyzing a deliberate indifference claim supported by a state-created danger theory of liability).

Here, Turner alleges that Defendants "showed deliberate indifference" to him by implementing an unconstitutional policy, the "stand down" order, "that substantially increased the harm to [him] and ultimately caused his injuries." (Compl. ¶ 84). As demonstrated above, there is no clearly established law supporting the novel due process right he asserts in this case. *See supra* Part IV.A. Further, there is no support for his position that a "deliberate indifference" standard is proper to satisfy the "shocks the conscience" element of his claim, outside the custodial context, based on a state-created danger theory. *Slaughter*, 682 F.3d at 321. Moreover, Turner's citation to non-binding authority is insufficient to articulate a clearly established right here. *Booker*, 855 F.3d at 538–39.

Accordingly, Count IV is barred by qualified immunity.[8]

---

[8]    Even assuming there was no qualified immunity and such a violation was adequately pled, Defendants conduct during and before the rally would not satisfy a deliberate indifference standard on the merits:

## V. Defendant City of Charlottesville

Plaintiff has asserted a *Monell* claim (Count III) against Defendant Charlottesville under the same state-created danger theory discussed above. While Congress intended municipalities to be considered "persons" under § 1983, "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort." *Monell,* 436 U.S. at 690–91. Among other things, a municipality may be held liable for a particular policy under §1983 "through the decisions of a person with final policy making authority." *Lytle v. Doyle*, 326 F.3d 463 (4th Cir. 2003). Notably, however, "a municipality cannot be held liable under § 1983 on a *respondeat superior* theory." *Monell*, 436 U.S. at 691.

For a municipality to be liable under 1983, a plaintiff must demonstrate an underlying constitutional violation. *Waybright v. Frederick Cty., MD*, 528 F.3d 199, 203 (4th Cir. 2008) ("[M]unicipalities cannot be liable under § 1983 without some predicate 'constitutional injury at the hands of the individual [state] officer,' at least in suits for damages." (quoting *City of Los Angeles v. Heller,* 475 U.S. 796, 799 (1986))); *Evans v. Chalmers*, 703 F.3d 636, 654 n.11 (4th Cir. 2012) ("Because we hold that all plaintiffs failed to state predicate § 1983 claims against the individual officers [due to qualified immunity], we must also hold that all plaintiffs have failed to state supervisory liability, *Monell* liability, and 'stigma-plus' claims."); *Stevenson ex rel.*

---

> There were officers standing by and creating a visible presence at the park, press conferences and press releases warning people of the potential for violence that was beyond the ability of law enforcement to control, a "command center" staffed with local, state, and even national law enforcement officials, firefighters, and ambulances, an attempt to shift the protest to another safer park, and officers in riot gear that eventually dispersed the assembly.

(Dkt. 31 at 18 (citing Compl. at ¶¶ 20, 23–25, 47, and 70)). Such conduct demonstrates that Defendants took precautions in anticipation of the rally and worked to ensure, at least on some basic level, public safety and order would be maintained.

*Stevenson v. Martin Cty. Bd. of Educ.*, 3 F. App'x 25, 33 (4th Cir. 2001) ("An award of damages against a municipality based on the actions of its officers is not available unless the officers' conduct amounted to a constitutional injury."). Here, although the Court explained above why the individual Defendants are entitled to qualified immunity, *see supra* Part IV.A., the decisions in *DeShaney, Pinder, Waybright, Doe,* and *Stevenson* all lead to the same conclusion that Plaintiff's underlying claims simply fail on the merits too. With no undergirding violation, the City has no § 1983 municipal liability.

Accordingly, Count III will be dismissed for failing to state a claim.

## VI. Conclusion

In sum, there is no clearly established constitutional right supporting any of Plaintiff's claims against Defendants Thomas and Flaherty. Therefore, Counts I, II, and IV, are barred by qualified immunity and will be dismissed. Even setting aside the issue of qualified immunity, precedent forecloses Plaintiff's claims. Consequently, with no underlying constitutional violation, Plaintiff's *Monell* claim against Defendant Charlottesville cannot survive. Therefore, Count III will be dismissed as well. With no remaining substantive claims, Counts V and VI (seeking attorney's fees[9] and punitive damages) will also be dismissed.

The Clerk of the Court is hereby directed to send a certified copy of this memorandum opinion and the accompanying Order to all counsel of record.

Entered this  29th  day of May, 2018.

NORMAN K. MOON
SENIOR UNITED STATES DISTRICT JUDGE

---

[9]     Technically, a request for attorney's fees "is not a separate cause of action." *Greene v. Phipps*, No. CIVA 7:09-CV-00100, 2009 WL 3055232, n.1 (W.D. Va. Sept. 24, 2009).